STATE OF NEBRASKA, APPELLEE, V. DANNY S. FARBER, APPELLANT.
498 N.W.2d 797

Filed January 26, 1993.   No. A-91-625.

Thomas M. Kenney, Douglas County Public Defender, and Brian S. Munnelly for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HANNON, IRWIN, and MILLER-LERMAN, Judges.

IRWIN, Judge.

This is an appeal from the criminal prosecution of Danny S. Farber, appellant, for the offense of possession of marijuana, more than 1 pound, in violation of Neb. Rev. Stat. § 28-416(1)(a) (Reissue 1989). This offense is a Class IV felony. § 28-416(7).

A motion to suppress evidence was filed prior to trial. The district court judge overruled the motion. After this ruling, appellant waived his right to a jury trial, and a stipulated bench trial was subsequently had, using the transcript from the motion to suppress hearing and police reports of the officers involved as evidence. Appellant properly preserved his objections regarding the propriety of the search and regarding the introduction of evidence seized during the course of the search.

The district court found appellant guilty of possession of marijuana, more than 1 pound, and subsequently sentenced him to an indeterminate sentence of not less than 20 months nor more than 3 years under the jurisdiction of the Nebraska Department of Correctional Services.

Appellant has timely filed an appeal with this court. We reverse, and remand for a new trial.

## ASSIGNMENT OF ERROR

Appellant's sole assignment of error is that the district court judge was incorrect in overruling appellant's motion to suppress evidence.

## STANDARD OF REVIEW

An appellate court will uphold the ruling of a trial court on a motion to suppress unless the trial court's findings of fact are clearly erroneous. In making this determination, the appellate court will not reweigh the evidence or resolve conflicts in the evidence, but recognizes that the trial court is the finder of fact and takes into consideration that the trial court observed the witnesses testifying in regard to the motion to suppress. *State v. Pope*, 239 Neb. 1009, 480 N.W.2d 169 (1992); *State v. Masat*, 239 Neb. 849, 479 N.W.2d 131 (1992).

## FACTUAL BACKGROUND

On October 8, 1990, Sgt. Jamie Leavitt, with the Omaha Police Division, received information from a citizen informant that appellant and/or his brother, Steven Farber, had been seen recently in a blue 1983 Pontiac Sunbird. Around 2 p.m. on this same day, Leavitt saw a vehicle matching the description he had been given, but he was unable to determine whether appellant

or Steven Farber was in the car. Leavitt also testified he was aware that each of the Farbers had warrants out for their arrest. Leavitt attempted to stop the vehicle containing the two men by activating his cruiser's red lights. However, the vehicle continued to drive on and entered a trailer court at 20th and Whitmore Streets. The Sunbird stopped in front of trailer No. 211, and both occupants of the vehicle exited and ran into trailer No. 211. Leavitt testified that both persons ignored his commands, made at gunpoint, to stop and not enter the residence. Leavitt had previously been informed that this trailer was where appellant, and possibly Steven Farber, resided.

Leavitt called for backup and waited for assistance to arrive. He remained at his location, observing the trailer until additional officers arrived. Leavitt testified that he took this action because he felt it would be better to wait for backup, since "[i]f these two were the two parties that I was looking for, and I wasn't positive on the identification, they both have records, there were two of them."

The officers immediately surrounded the residence. The police were about to enter the trailer when the two individuals who were observed earlier in the automobile voluntarily came out of the trailer. These persons were then handcuffed and placed under arrest. Leavitt testified that when the two individuals came out of trailer No. 211, he was uncertain whether they were appellant and Steven Farber or whether one brother might have remained in the trailer. He also stated that he was concerned there might possibly be children in the trailer who would be left unattended once the two adults were removed from the scene. Leavitt and Officer Steven Gonzales entered the trailer to search for any abandoned children and to conduct a security check of the area for officer safety.

Leavitt testified the trailer was searched for any person who might be hiding inside by searching the rooms, closets, or anything else where a person might fit. During the course of the search, Leavitt discovered, in plain view, leaves and stems of marijuana on the floor in one of the rooms.

Gonzales testified that he was also one of the officers who entered the trailer to search for individuals. He testified that he first went into the living room, then into a bedroom and into a

closet. He testified that he opened the closet door to ensure that no one was hiding inside and that at that time, he was "hit by an odor that [he] knew was marijuana." He testified that there was a bag in plain view in the closet when he opened the closet door. The bag was opened, and marijuana was exposed. He testified further that there was another closet he searched and that marijuana was also found in it. The marijuana in the second closet was all in plastic bags.

The residence was then secured, and a search warrant was obtained for a more thorough inspection of the residence. The execution of the search warrant resulted in the confiscation of approximately 4 pounds of marijuana.

A motion to suppress was properly filed, and a hearing was held. The trial court found the officers had acted properly in entering the trailer to determine whether or not there were children in the trailer and to ensure officer safety.

Appellant was tried on stipulated facts and the police reports concerning the arrest of appellant. The court also took judicial notice of the proceedings regarding the motion to suppress, which had been heard previously by the same judge. Appellant was found guilty and was sentenced.

## DISCUSSION
### EXIGENT CIRCUMSTANCES

A citizen's expectation of privacy is greatest in his or her home. The U.S. Supreme Court has faithfully maintained the privacy interest in the home, requiring a warrant or consent of the resident as a prerequisite to an evidentiary search. *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978).

The U.S. Supreme Court has permitted warrantless, nonconsensual residential searches when certain exigencies materialize which do not have as their sole motivation the search for evidence of crimes. Abundant exigent circumstances have been recognized by the U.S. Supreme Court. A small sampling includes the following: emergency searches (*McDonald v. United States*, 335 U.S. 451, 69 S. Ct. 191, 93 L. Ed. 153 (1948)), hot pursuit (*Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967)), and prevention of destruction of evidence (*Vale v. Louisiana*, 399 U.S. 30, 90 S.

Ct. 1969, 26 L. Ed. 2d 409 (1970)).

## BASES OF SUPPRESSION RULING

The district court in the case before us relied on two bases in justifying the warrantless, nonconsensual search of the home. The first was the exigent circumstance of an emergency search. The second basis it relied on was the doctrine declared in *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990), regarding security checks, or "protective sweeps." In its abridged version, this latter doctrine decrees that a law enforcement officer, armed with an arrest warrant and probable cause to believe the arrestee is in the home, is entitled to take reasonable steps to ensure his or her safety in the home while making and after an arrest. These reasonable steps include a protective sweep of the portions of a residence that may harbor an individual posing a danger to those on the arrest scene. This protective sweep, or security check, is justified only when the officer has a reasonable, articulable suspicion that the house is harboring a person posing such a danger and the officer's original entry into the home was lawful.

## PROTECTIVE SWEEP

A closer inspection of *Buie* is helpful in examining the trial court's reliance on the officers' right to conduct a protective sweep, or security check, of the home in the instant case. In *Buie*, police officers were investigating a robbery committed by two men, one of whom was wearing a red running suit. After acquiring arrest warrants for two suspects, including Buie, the officers executed one of the warrants in Buie's home, apprehending the accused as he emerged from the basement. An officer then entered the basement " 'in case there was someone else' " in the basement. *Buie*, 494 U.S. at 328. He noticed a red running suit lying in plain view and seized it.

The U.S. Supreme Court held that the Fourth Amendment permits, in conjunction with an in-home arrest, a warrantless protective sweep extending to a cursory inspection of those places where a person may be found, lasting no longer than it takes to dispel the reasonable suspicion of danger and, in any event, no longer than it takes to complete the arrest and depart the premises. The searching officers must possess a reasonable

belief based on specific and articulable facts which, taken together, would warrant a reasonably prudent police officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

Appellant misreads *Buie*, stating in his brief that "[t]he [U.S.] Supreme Court has recently modified and greatly expanded the restriction to searches incident to arrest." Brief for appellant at 13. The Court in *Buie* specifically explained that *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), the nascent case regarding searches incident to arrest, was not the basis for its decision regarding protective sweeps.

Affirmance is not required by *Chimel* v. *California*, 395 U.S. 752 (1969), where it was held that in the absence of a search warrant, the justifiable search incident to an in-home arrest could not extend beyond the arrestee's person and the area from within which the arrestee might have obtained a weapon. First, *Chimel* was concerned with a full-blown search of the entire house for evidence of the crime for which the arrest was made, see *id.*, at 754, 763, not the more limited intrusion contemplated by a protective sweep. Second, the justification for the search incident to arrest considered in *Chimel* was the threat posed by the arrestee, not the safety threat posed by the house, or more properly by unseen third parties in the house. To reach our conclusion today, therefore, we need not disagree with the Court's statement in *Chimel*, *id.*, at 766-767, n. 12, that "the invasion of privacy that results from a top-to-bottom search of a man's house [cannot be characterized] as 'minor,' " nor hold that "simply because some interference with an individual's privacy and freedom of movement has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require," *ibid.* The type of search we authorize today is far removed from the "top-to-bottom" search involved in *Chimel*; moreover, it is decidedly not "automati[c]," but may be conducted only when justified by a reasonable, articulable suspicion that the house is

harboring a person posing a danger to those on the arrest scene.

*Maryland v. Buie*, 494 U.S. 325, 336, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).

A profound fact that distinguishes Buie from this appellant's situation is that in *Buie*, the officers were lawfully in the home, executing an arrest warrant, when they felt it necessary to sweep the house for any of Buie's confederates who would pose a real and substantial risk to the officers' safety. This was not the situation with the Omaha police officers in our case. The importance of this fact, that *Buie* involved an in-home arrest, is brought home by the U.S. Supreme Court quoting from the Court of Special Appeals of Maryland decision regarding *Buie*:

" 'Traditionally, the sanctity of a person's home—his castle—requires that the police may not invade it without a warrant except under the most exigent of circumstances. But once the police are *lawfully within the home*, their conduct is measured by a standard of reasonableness . . . . [I]f there is reason to believe that the arrestee had accomplices who are still at large, something less than probable cause—reasonable suspicion—should be sufficient to justify a limited additional intrusion to investigate the possibility of their presence.' "

(Emphasis omitted.) (Emphasis supplied.) *Buie*, 494 U.S. at 329.

Appellant's aim is on the mark when he states that *Buie* does not apply to this case. This is true because, unlike the situation in *Buie*, the police in our case were never lawfully within the home. Appellant's and his companion's arrests took place outside the home, unlike Buie's in-home arrest. Furthermore, the testimony is undisputed that the officers were pursuing two men and arrested two men.

The notion that *Buie* turns on the fact that the police were lawfully within the home before they conducted the protective sweep is bolstered by the statistic that the Supreme Court mentioned this fact no less than 10 times in the majority opinion.

To draw out the application of *Buie*, as posited by appellee, if police arrest a suspect in a residential neighborhood, what is to

preclude the police from entering surrounding homes where perhaps the suspect's neighbors, friends, and confederates may be lurking to ambush the police? If the suspect has been observed to frequent his neighbors' homes and the conclusion is reached that such people may be his friends and possibly pose a threat to the effective arrest of the suspect, such a scenario may become credible.

The object of the preceding remarks is not to minimize the extreme risks that law enforcement officers are genuinely imperiled by all too often in today's communities. The rule in *Buie* is a rule that was necessarily espoused by the Supreme Court and was perhaps long overdue. As recently as 1988, Nebraska had no statute or case law dealing with the subject of protective sweeps. See *State v. Monzu*, 227 Neb. 902, 420 N.W.2d 726 (1988) (single-judge opinion). That situation has now been corrected by the *Buie* decision.

In the case at hand, the arrest did not take place inside the house, and therefore, this security check does not fall within the bounds of the *Buie* rule regarding in-home arrests and associated protective sweeps and checks. The trial court was incorrect in finding that the police were justified in entering the home to conduct a protective sweep.

## EMERGENCY DOCTRINE

The emergency doctrine has been described in Nebraska most recently in *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). In *Plant*, the defendant argued that exigent circumstances were lacking when Omaha police officers entered his home to ensure the safety of children they believed to be in the residence.

Prior to their entrance, the police were investigating the circumstances surrounding the critical injuries of an 18-month-old child. Upon arriving at the hospital, they were informed that the child's stepfather, the defendant, was returning to the home to check on the well-being of three other children. The defendant telephoned the hospital and told police that he had taken the children to a babysitter's house. The defendant's wife, mother, and sister told police they were unaware of such babysitter. Police were also advised that the

defendant did not have a telephone in his home. Officers were dispatched to the defendant's residence to locate the three children. They knocked on the front and back doors, but received no response. The lights were out, and the blinds were drawn. A car matching the description of the defendant's car was observed driving away from a parking lot across the street from the residence. The defendant again telephoned police and informed them that his car had broken down. When police went to pick him up, he could not be located. Approximately 2 hours after this second phone call, the location of the children was still unknown. Police again returned to the residence. After again knocking and receiving no response, they forced their way into the home. One officer testified that his intent in entering the home was to find the children and check on their well-being. The Supreme Court upheld the search, stating:

> Before forcing entry into the Plants' home, the entering police officers had information from which they could reasonably conclude that two 4-year-old children and a 2-week-old infant were unaccounted for and had been left unattended for several hours. The entering officers had attempted unsuccessfully to verify reports of Plant's wife, mother, and sister that the children were at the Plants' residence. The officers were also aware that the information Plant had given other officers as to his and the children's whereabouts and activities was misleading. One of the officers had observed an automobile matching that of the defendant in a lot across the street from the Plants' residence. It left the area without the driver's contacting the police or the residence. The entering officers were also familiar with a report to police that 4-year-old James Bartlett had suffered continual abuse by the defendant and that Christopher Bartlett was in critical condition because of his injuries.

> All of this information was gathered by police from reliable sources and demonstrates that the officers entering the Plants' home had reasonable grounds to believe that an emergency was at hand and that there was an immediate need for police assistance for the protection of the three small unaccounted-for children.

*Plant*, 236 Neb. at 326, 461 N.W.2d at 262-63.

The elements of the emergency doctrine are:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to arrest and seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. [Citation omitted.] In the absence of a warrant, the State has the burden to prove that the search was conducted under circumstances substantiating the reasonableness of the search or seizure.

*Id.* at 325-26, 461 N.W.2d at 262.

In the instant case, Leavitt testified that he entered the residence to determine if the "other Farber" was inside, a reason which we hold does not authorize such a warrantless and nonconsensual entry. Additionally, though, he testified that he entered to search for any children who might be inside, as he said he "knew some children had been there." No foundational testimony was elicited regarding the officer's knowledge that children were there, other than the presence of children's toys outside the residence.

Gonzales testified that his sole purpose in entering the trailer was to look for suspects.

The entire sum and substance of the officers' testimony regarding their suspicion of children being in the home was as follows:

Q [Prosecutor]. Then what happened?

A [Leavitt]. Then myself and two other officers proceeded to go into the trailer. We went in for a couple of reasons. Again, I wasn't sure who I had here, so we checked the trailer for Danny or Steve Farber to see if they were hiding inside the trailer. And in addition, to search for any children who might have been in there.

. . . .

Q. For what reason did you suspect there may be children in the trailer?

A. I knew some children had been there, and there were

also some Big Wheels and toys outside, indicating that children had lived there, and could have been there at that time.

. . . .

Q. Prior to going in you hadn't see [sic] anyone else around the trailer or in the trailer, had you, other than these two?

A. No.

Q. You didn't see any children around?

A. No.

The amount of information available to these police officers from which they could reasonably conclude that children were inside, that an emergency existed, and that the children's welfare needed to be determined, was slight. To hold otherwise would mean that every time an arrest takes place outside a residence with toys in the yard, the police are justified in believing that an emergency exists and that a warrantless, nonconsensual entry into a private home is sanctioned. However, such was not the case from the testimony elicited.

Based on the record, the trial court was incorrect in finding that an emergency justified the initial entrance into the home.

## CONCLUSION

Therefore, all evidence seized as a result of the warrantless and nonconsensual entry into the home should have been suppressed. The error requires that the judgment be reversed, and the cause is hereby remanded for a new trial consistent with the holdings in this opinion.

REVERSED AND REMANDED FOR A NEW TRIAL.