**Order, Concurring Opinion On Denial of En Banc Relief, and Dissenting Opinions From Denial of En Banc Relief filed August 3, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00886-CR

---

### RAMON RIOS, III, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 232nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1491213**

---

## DISSENTING OPINION FROM DENIAL OF EN BANC RELIEF

I dissent from this court's denial of en banc relief because the panel majority's opinion (1) is contrary to controlling precedent from the United States Supreme Court concerning two important federal questions involving the Fourth Amendment to the United States Constitution (*i.e.*, (a) whether police officers may conduct protective sweeps of private homes even when (i) they complete an arrest outside, (ii) there are no specific and articulable facts that anyone inside said

homes poses any danger to anyone, and (iii) police have already completed their arrest and departed the premises with the arrestee; and (b) whether the plain view doctrine applies even (i) under the foregoing facts, (ii) when officers neither search nor seize the evidence in question before acquiring a warrant, and (iii) when officers cannot see the narcotics made the basis of a search warrant because the narcotics are inside an opaque black trash bag inside another bag inside a home); (2) is contrary to controlling precedent from the Texas Court of Criminal Appeals; and (3) conflicts with the decisions of numerous state courts of last resort and United States courts of appeals concerning clearly established Fourth Amendment rights under the United States Constitution.

## I.    Facts

Appellant was inside his home when police arrived with two warrants authorizing his arrest for murder.  They breached the door, broke out the windows, and ordered him outside.  He complied and was arrested on his front porch. Officers could see inside through the broken windows, but did not see anyone else therein.  Officers handcuffed him, took him across the street, placed him in a police car, and interviewed him for approximately 10-15 minutes.  After those 10-15 minutes passed, officers returned to his house, entered it, and performed several searches without a search warrant.

Deputy Alexander (the High-Risk Operations Unit ["HROU"][1] team leader responsible for planning the operation) testified that he "had the duties to do a protective sweep of the residence to make sure it's secure for any investigators or anybody else" and that he saw narcotics "in the initial search as soon as [they] went inside the residence . . . in the red bag right outside the back door."[2]  Pictures

_____

[1] HROU is Harris County's predecessor to SWAT.

[2] 3 RR 86-87.

2

of the red bag and the black bags in the residence were introduced at trial.[3]  The panel majority accepted Deputy Alexander's testimony that (based on viewing the bags) the black bags contained narcotics.  *See Rios v. State*, No. 14-18-00886-CR, 2020 WL 5048593, at *2 (Tex. App.—Houston [14th Dist.] Aug. 27, 2020, no pet. h.)  ("Maj. Op.") ("Alexander testified that . . . while standing in the kitchen of the house, he saw . . . what appeared to be a brick of cocaine . . . .").

At trial, Deputy Alexander also admitted that officers knew (1) the house in question had been under surveillance 24 hours a day for two and a half months,[4] (2) officers conducted surveillance the night before the arrest warrant was executed, (3) they had information about "the comings and goings of the people who lived at that residence," (4) "that there was a child and female at the residence," (5) "every morning" the child was going to leave the residence to go to school, (6) the mother and child had left the house the morning the arrest warrant for Appellant was executed (because officers had physically stopped and "contained"/"detained" them), (7) they "didn't have any evidence or any information" indicating that there was somebody else in the house, and (8) "as far as [they] knew, there was no one else there [at the house]."[5]

---

[3] 5 RR, at exhibits 11 and 12.

[4] Despite this surveillance, these recordings were not provided to Appellant or his defense counsel because they had been overwritten.  This failure facially implicates the Michael Morton Act.  While this issue was preserved at the trial court, it was not presented on appeal.  At trial, Appellant's counsel also made a general allusion to spoliation, but not one that was sufficient to present the issue to the trial court or to preserve it for appellate review.  Similarly, the record troublingly reveals relevant emails were "purged", but this issue was not presented to us on appeal.

[5] The concurrence on denial of en banc relief (hereinafter, "the concurrence") nonetheless concludes the facts "were sufficient to establish that individuals may have been in the house and those individuals could have posed a danger to the officers at the scene."  Concurring Op. at 9 (footnotes omitted).  But, given the unambiguous record before us, no reasonable person could conclude there was any specific and articulable fact supporting a belief that anyone other than Appellant was in the house, and thus the concurrence misapplies the applicable standard of

3

Despite these indisputable facts, officers testified that they entered Appellant's home and conducted a (so-called) "protective sweep". The HROU team leader explained that:

- "*[N]o matter how much intel I'm given*, until I physically go inside that residence and look, that I know that 100 percent there's no one inside." (emphasis added).

- His team performs "a protective sweep on *every* residence that we go to." (emphasis added). *But see* Concurring Op. at 10 ("The simple fact is that whether a protective sweep was justified and whether drugs were appropriately seized are fact-intensive questions. These decisions, by their nature, must be based on the facts of each particular case[.]").

When the initial search was completed, the HROU team leader did "a secondary clear to make sure there [were] no persons inside"; this secondary clear was "a very slow methodical search" because he was "looking for people". During this warrantless secondary sweep, Deputy Alexander discovered a second set of black bags (that he presumed contained narcotics) on top of a white cooler.

Deputy Alexander also testified that after the house was cleared, officers "go one last time through the residence and pick up anything that we might have used during the operation and bring it out"; this could include "breakaway tools, the battering ram. Anything that we might have used during that operation, they're going back through and making sure we clean up all of our equipment." Despite

---

review. *See Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004) ("On appeal, the question of whether a specific search or seizure is 'reasonable' under the Fourth Amendment is subject to *de novo* review.") (citing *Ornelas v. United States*, 517 U.S. 690, 691 (1996) ("[w]e hold that the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo*"); *United States v. Sargent*, 319 F.3d 4, 8 (1st Cir. 2003) ("[t]his court reviews *de novo* the ultimate conclusion as to whether a search was reasonable within the meaning of the Fourth Amendment"); *United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002) ("[w]e review *de novo* the ultimate question of whether a search or seizure was reasonable under the Fourth Amendment"); and *United States v. Spikes*, 158 F.3d 913, 922-23 (6th Cir. 1998)).

this testimony, there is no evidence in the record of any such tools being used inside the house or being removed by officers. According to Deputy Alexander, the whole process took approximately 20 minutes (and more than five); according to another officer, it took 30 or 45 minutes. Officers were only instructed to depart the residence after Deputy Alexander personally went through every room, looked in every place where a body could fit, and personally deemed the residence safe. After this third warrantless search, officers sent in a photographer to document the damage (an independent and documented warrantless invasion of the home).

Deputy Persaud (who was investigating "mid-level drug traffic" at the residence) testified he arrived on-scene after the residence was secured and was told by Deputy Alexander that narcotics were inside the home. Based thereon, Deputy Persaud drafted an affidavit for a search warrant. Said affidavit states (in relevant part):

> Deputy Alexander advised your Affiant that he observed a gun case on the right side of the living room containing an assault rifle and a handgun when he went into the house . . . . Deputy Alexander advised your Affiant continued [sic] to make his way toward Roman Rios III location [sic]; Deputy Alexander advised your Affiant that he observed brick shaped packages wrapped in black electrical tape, that are consistent with the shape and size of a kilogram of cocaine . . . . Deputy Alexander advised your Affiant that he observed . . . an open red piece of luggage/suit case. Deputy Alexander advised your affiant that he observed the red suitcase was open and observed what appeared to be kilogram packages that were rectangular, wrapped in black electrical tape. Deputy Alexander advised your Affiant that based on his training and experience, he knows that the type of packaging is consistent with the way cartels and others in the narcotics industry package narcotics for distribution.

This affidavit, however, is contrary to the record.

Specifically, Deputy Persaud's affidavit states Deputy Alexander told him the red suitcase contained rectangular kilogram packages wrapped in black

5

electrical tape. However, Deputy Alexander's testimony never mentions tape (much less electrical tape) or rectangular packages; instead, Deputy Alexander testified that during his initial search, he saw black "bags" inside of a red suitcase.[6] Additionally, Deputy Alexander did not see either an assault rifle or a handgun upon entry into the home; instead, he unambiguously testified that the gun case in question was closed.[7] As a result, the subsequently issued search warrant was predicated upon materially false information combined with information that was acquired during the second warrantless search. *See, e.g.*, 5 RR 10 (showing the rectangular packages found on top of the cooler during the second warrantless search). The panel majority presumed that "the second phase of the sweep violated the Fourth Amendment." Maj. Op. at 14.

Appellant produced an uncontroverted expert at the hearing on his motion to suppress. This expert testified that (1) he reviewed the reports and there was no evidence of someone else entering or leaving the residence, (2) there were four separate entries into the residence without a warrant, (3) a protective sweep in a house that size with that many officers should take two or three minutes, (4) the officers knew there was only one person in the house, (5) the initial sweep took too long, and (6) the officers put themselves at greater risk by entering the house.

## II. Law

Certain basic facts about the Fourth Amendment are already well-settled law. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[6] During questioning, these bags were referred to as "trash" bags or "garbage" bags without correction or modification.

[7] 3 RR 216 ("Q. You saw a gun case, right? A. I saw the gun case. Q. But it was closed? A. Right. Q. Okay. That says that there were two firearms inside the gun case at the time you went into the house. But it was closed, right? A. It was closed, yes.").

seizures." U.S. Const. amend. IV. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"[8] Searches conducted without a warrant inside a home are presumptively unreasonable absent consent or exigent circumstances. *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987); *see also Steagald v. United States*, 451 U.S. 204, 211, 222 (1981); *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)).

If governmental actors conduct a warrantless search inside a home, they bear a heavy burden to prove it was reasonable and permitted by the Fourth Amendment.[9] This burden is particularly heavy given that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *See Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984). There is no evidence in the record that Appellant (or anyone else) consented to the search and the State never argued that there was an exigency. Therefore, the search was presumptively unreasonable as a matter of controlling law. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

---

[8] *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *Payton v. New York*, 445 U.S. 573, 585 (1980) (same) (quoting *U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. at 313); *Torrez v. State*, 34 S.W.3d 10, 18 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("One of the shined foundations of the rule of law is its abhorrence of the warrantless search of a home. When neither life nor limb of the police are endangered, their foremost duty to protect liberty must persist. Even in the face of real or objectively perceived threat, the police response must always be rational, dispassionate and measured. *The goal of police work is not the invasion but the protection of liberty*.") (emphasis added).

[9] *Welsh*, 466 U.S. at 749-50 ("[P]olice bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."); *see also Gutierrez*, 221 S.W.3d at 685 ("[T]he warrant requirement is not lightly set aside, and the State shoulders the burden to prove that an exception to the warrant requirement applies.") (citing *United States v. Robinson*, 414 U.S. 218, 243 (1973); *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003)).

The relevant exception to the Fourth Amendment's warrant requirement relied upon by the State can be found in the doctrine of protective sweeps. *See generally Maryland v. Buie*, 494 U.S. 325, 327-28 (1990); *see also United States v. Garcia-Lopez*, 809 F.3d 834, 838 (5th Cir. 2016); *United States v. Wilson*, 36 F.3d 1298, 1306 (5th Cir. 1994). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie*, 494 U.S. at 327; *Reasor v. State,* 12 S.W.3d 813, 815 (Tex. Crim. App. 2000). The United States Supreme Court has identified two distinct types of constitutionally permissible protective sweeps:

(1) "[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched";[10] and

(2) "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene."[11]

---

[10] *Buie*, 494 U.S. at 334; *see also id.* at 332-33 ("Possessing an arrest warrant and probable cause to believe [defendant] was in his home, the officers were entitled to enter and to search anywhere in the house in which [he] might be found. Once he was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched.").

[11] *Id.* at 337; *see also United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005) (quoting *United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004) (en banc), *cert. denied*, 543 U.S. 955 (2004)); *Torrez*, 34 S.W.3d at 17 ("[A] police officer may only conduct a protective sweep of a residence where he possesses an objectively reasonable belief, based on specific and articulable facts, that a person in the area poses a danger to that police officer or to other people in the area.") (citing *Reasor*, 12 S.W.3d at 816-17); *cf. United States v. Bowdach*, 561 F.2d 1160, 1168 (5th Cir. 1977) ("The law in this circuit holds that police officers have a right to conduct a quick and cursory check of a residence when they have reasonable grounds to believe that there are other persons present inside the residence who might present a security risk.").

Despite the HROU team leader's testimony that HROU performs a protective sweep on *every* residence to which it goes, "[a] protective sweep is not an automatic right the police possess", even when making an in-home arrest.[12]

A protective sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger" and "no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335-36; *Torrez*, 34 S.W.3d 10, 18 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (citing *Buie*, 494 U.S. at 335).[13] "The sweep must not be a 'full search of the premises.' Rather, it may only extend 'to a cursory inspection of those spaces where a person may be found' and may only last long enough to 'dispel the reasonable suspicion of danger.'" *Torrez*, 34 S.W.3d at 18 (quoting *Reasor*, 12 S.W.3d at 816-17); *United States v. Roberts*, 612 F.3d 306, 311 (5th Cir. 2010).

---

[12] *See Torrez*, 34 S.W.3d at 18 (citing *Reasor*, 12 S.W.3d at 816); *Arceo v. State*, No. 14-98-00854-CR, 2000 WL 1421560, at *2 (Tex. App.—Houston [14th Dist.] Sept. 28, 2000, pet. ref'd) (not designated for publication) ("[T]he protective sweep is not an automatic right police possess. It is permitted only when 'justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene.'") (citing *Buie*, 494 U.S. at 336); *see also United States v. Brodie*, 975 F. Supp. 851, 855 (N.D. Tex. 1997) ("Officers may conduct a warrantless protective sweep in conjunction with an in-home arrest when the officers have a reasonable belief, based on specific and articulable facts, that the area to be swept harbors an individual posing a danger to those on the arrest scene . . . . The protective sweep doctrine is inapplicable in this case because (1) Brodie was *arrested outside* of his residence; (2) the officers *did not articulate any specific facts* which led them to believe that Brodie's residence harbored individuals posing a danger to those on the arrest scene; and (3) the warrantless search *extended beyond the rooms* 'immediately joining the place of arrest.'") (emphases added).

[13] *See also United States v. Paradis*, 351 F.3d 21, 29 (1st Cir. 2003); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 123 (2d Cir. 2018); *United States v. Foley*, 218 F. App'x 139, 143 (3d Cir. 2007); *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012); *United States v. Silva*, 865 F.3d 238, 243 (5th Cir. 2017); *United States v. Shores*, 93 F. App'x 868, 870 (6th Cir. 2004); *United States v. Tapia*, 610 F.3d 505, 510 (7th Cir. 2010); *United States v. Davis*, 471 F.3d 938, 944 (8th Cir. 2006); *United States v. Lemus*, 582 F.3d 958, 962 (9th Cir. 2009); *United States v. Banks*, 884 F.3d 998, 1013 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 638 (2018); *United States v. Yeary*, 740 F.3d 569, 580 (11th Cir. 2014); and *United States v. Thomas*, 429 F.3d 282, 287 (D.C. Cir. 2005).

# III.    Analysis

It is undisputed that Appellant was arrested outside his home. *See* Maj. Op. at 8 ("Law enforcement officers then handcuffed appellant on the front porch . . . ."). Further, there is no evidence Appellant had any control over the interior of his home at the time of his arrest. Therefore, the first type of protective sweep (incident to arrest and into other spaces immediately adjoining the place of arrest) cannot authorize the officers' storming of the home's interior. *See Price v. State*, No. PD-0722-19, 2020 WL 5754618, at *3 (Tex. Crim. App. Sept. 23, 2020) (The search-incident-to-arrest exception "has historically been formulated into two distinct propositions. The first is that a search may be made of the person of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area *within the control* of the arrestee.") (emphasis added) (quoting *United States v. Robinson*, 414 U.S. 218, 224 (1973)).[14]   Consequently, the officers' protective sweep was only authorized if they "possesse[d] a reasonable belief based on specific and articulable facts that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337.

The panel majority erred when it concluded the protective sweep at issue was reasonable under the Fourth Amendment because officers (1) had no specific and articulable facts that anyone was in the home (let alone that anyone presented a danger to anyone), (2) had already completed their arrest of Appellant, (3) had already departed the premises with him, and (4) subjectively believed "there was no one else there [at the house]." We should "*strictly* scrutinize such alleged

---

[14] *See also Price*, 2020 WL 5754618, at *3 (searches of broader areas where arrest occurred may require "the State to establish that the arresting officer had reason to believe the arrestee could possibly gain access to a weapon or evidence before the Fourth Amendment permits a warrantless search."); *Buie*, 494 U.S. at 332-33 ("Once [defendant] was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched.").

precautionary searches to insure that there exists a serious and demonstrable potentiality for danger." *United States v. Smith*, 515 F.2d 1028, 1031-32 (5th Cir. 1975) (per curiam) (emphasis added). Here, there is no such demonstrable potentiality for danger, thereby exacerbating the officers' presumptively unreasonable conduct under the Fourth Amendment to the United States Constitution.

## A. The protective sweep doctrine is inapplicable.

### 1. There are no specific and articulable facts that Appellant's home harbored an individual who posed a danger to anyone.

The State argued (and the panel majority accepted) that the officers' intrusion into Appellant's home was constitutionally authorized because there were "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." However, the officers had no such belief and no facts in the record are capable of supporting one. Therefore, the State cannot overcome either (1) its burden to "demonstrate an urgent need that might justify warrantless searches or arrests" (*see Welsh*, 466 U.S. at 749-50) or (2) the presumptive unreasonableness of the officers' warrantless search of Appellant's home. *See Hicks*, 480 U.S. at 326-27; *Steagald*, 451 U.S. at 211, 222.

According to the State's brief, the "specific and articulable facts" justifying the officers' protective sweep are limited to (1) the absence of testimony that the front porch or yard were safe, (2) testimony that the protective sweep was conducted to protect officers, (3) officers' "reason to believe that drug trafficking was occurring at the residence," (4) officers' "information that [Appellant] had firearms inside," (5) Appellant's two warrants for murder, (6) the presence of a

rifle case in the living room, (7) the presence of dogs, (8) an open back door, and (9) the foreseeability that "a reasonably prudent officer could have believed that a third person might be inside who could pose a threat to the officers outside." Despite these facts being accepted by the panel majority (*see* Maj. Op. at 10-11), none of them even arguably tend to show that any officer believed the inside of Appellant's home harbored an individual posing any danger to anyone.

Instead, Deputy Alexander (the team leader) admitted that officers had been surveilling the house, that they expected people to leave it, that they watched people leave it, that they "didn't have any evidence or any information" someone else was in the house, and that "as far as [they] knew, there was no one else there." There is no conceivable basis (much less a reasonable one) upon which these admitted facts can generate an objectively reasonable belief that there was anyone inside the home who presented a danger to anyone after Appellant was arrested. *See Reasor*, 12 S.W.3d at 816 (citing *Buie*, 494 U.S. at 337); *see also* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.4(c) (6th ed. 2020) ("The *Buie* reasonable suspicion test, stated in terms of a basis for belief 'that the area to be swept harbors an individual posing a danger to those in the arrest scene,' appears to require reasonable suspicion both (a) that another person is there, and (b) that the person is dangerous."). Despite this absence of specific and articulable facts, Deputy Alexander testified that his team (1) performs "a protective sweep on *every* residence that we go to" and (2) would do so "*no matter how much intel*" they had received. (emphases added). This brazenly shocking systemic disregard of the Fourth Amendment demands correction that this en banc court lacks the will to provide.[15]

---

[15] *See United States v. Reynolds*, 526 F. Supp. 2d 1330, 1339-41 (N.D. Ga. 2007) ("Deputy Henry testified that his policy when executing a warrant was to look through the house wherever the suspect named on the warrant might be found . . . . By definition, protective

sweeps within the meaning of *Buie* cannot be based on general policy.") (citing *Florida v. J.L.*, 529 U.S. 266, 272-73 (2000) (declining to adopt a firearm exception to stop-and-frisk *Terry* analysis); *Mincey v. Arizona*, 437 U.S. 385, 390-91 (1978) (rejecting an exception to the warrant requirement for searches of homicide scenes); and *United States v. Hauk*, 412 F.3d 1179, 1187 (10th Cir. 2005)); *United States v. Schultz*, 818 F. Supp. 1271, 1274 (E.D. Wis. 1993) ("Although Hausner testified it is 'standard procedure' to conduct protective sweeps whenever arrest warrants for a suspect are executed within a suspect's home, this Court does not read *Buie* as giving *carte blanche* authority for law enforcement officers to conduct protective sweeps in all such cases. If it did, the requirement for reasonable suspicion based on specific and articulable facts, would be meaningless."); *United States v. Warwick*, No. 16-CR-4572-WJ, 2018 WL 3056049, at *11 (D. N.M. 2018) (observing in dicta that a custom of conducting protective sweeps "suffices to show that such a policy exceeds the bounds of the Fourth Amendment"); *see also United States v. Menchaca-Castruita*, 587 F.3d 283, 295-96 (5th Cir. 2009) ("There will always be some *possibility* that an unknown person might be hiding somewhere inside a residence, waiting for an opportunity to attack law enforcement officers or to destroy evidence.") (emphasis in the original); *Kirkpatrick v. Butler*, 870 F.2d 276, 282 (5th Cir. 1989) ("Despite the police's belief in the likelihood that a confederate of an arrested individual may almost always be in the arrestee's apartment, the police *must* articulate reasonable grounds for believing that the suspected accomplice is indeed there. An unsubstantiated belief that confederates may gather in a single apartment does not suffice to permit the police to search an apartment that they would otherwise lack a valid basis to search.") (emphasis added), *cert. denied*, 493 U.S. 1051 (1990); *Reasor*, 12 S.W.3d at 817 (concluding a protective sweep was illegal where officer "did not express his belief that any third persons were inside the appellant's home" and did not "once articulate his belief that a third person inside the home was attempting to jeopardize either his or the public's safety."); *accord United States v. Gandia*, 424 F.3d 255, 264 (2d Cir. 2005) (requiring more than lack of information to justify a protective sweep); *United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004) ("The government contends that the agents had a reasonable belief that other people might be in the motel room due to their suspicion that Moran was a drug courier, their experience that drug couriers often meet up with their contacts, and their awareness that drug traffickers are frequently armed and dangerous. Although the district court and magistrate agreed with this argument, we find that such generalizations, without more, are insufficient to justify a protective sweep.") (citing *United States v. Taylor*, 248 F.3d 506, 514 (6th Cir. 2001) (generalized suspicion that defendant was a drug dealer was inadequate, standing alone, to justify protective sweep)); *id.* ("No facts specific to this case support a finding that the agents reasonably believed (1) that anyone other than Moran was present inside the motel room, or (2) that anyone so concealed posed a danger to their safety . . . . Not only was there no objective basis to warrant a reasonable suspicion of danger from a second person, there was also no evidence of subjective fear on the part of the agents."); *State v. Fisher*, 250 P.3d 1192, 1195 (Ariz. 2011) ("[I]f officers act purely on speculation, a protective sweep is unreasonable."); and *id.* at 1196 ("Officers cannot conduct protective sweeps based on mere speculation or the general risk inherent in all police work. Because the officers here did not articulate specific facts to establish a reasonable belief that someone might be in the apartment, the protective sweep was invalid."). *Cf. Sayers v. State*, 433 S.W.3d 667, 679 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Although Officer LaPoint testified that when approaching a house officers generally 'have to be careful' because '[y]ou never know what could happen,' he did not testify that he, or any of the other arresting officers, believed that appellant or Scalia posed a threat to their safety,

13

The Fourth Amendment was designed to protect against this exact type of invasion into the privacy of private homes and there are no "specific and articulable facts" in this case which can even begin to justify an exception thereto. *See Buie*, 494 U.S. at 332 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Under the majority's (and the concurrence's) reasoning, officers who conduct warrantless arrests outside homes can now force their way inside to ensure there are no dangers inside, even when they have had the property under surveillance for months and are virtually certain no one is there. This constitutes an unacceptably unreasonable departure from controlling jurisprudence, the basic guarantees of the Fourth Amendment, and a significant number of decisions from both state courts of last resort[16] and United States courts of appeals[17] concerning protective sweeps. This

---

nor did he testify to any specific, articulable facts that would have supported such a belief.").

[16] *See Torrez*, 34 S.W.3d at 18; *see also State v. Spietz*, 531 P.2d 521, 525 (Alaska 1975); *People v. Celis*, 93 P.3d 1027, 1033-36 (Cal. 2004); *People v. Aarness*, 150 P.3d 1271, 1280 (Colo. 2006) (holding seizure was constitutional because "the police had an articulable suspicion that another occupant remained inside the house because they were told someone was upstairs."); *State v. Spencer*, 848 A.2d 1183, 1195-96 (Conn. 2004) ("The generalized *possibility* that an unknown, armed person may be lurking is not, however, an articulable fact sufficient to justify a protective sweep. Indeed, nearly every arrest involving a large quantity of drugs, in or just outside of a home, carries the same possibility. To allow the police to justify a warrantless search based solely upon that possibility would threaten to swallow the general rule requiring search warrants.") (emphasis in original), *cert. denied*, 543 U.S. 957 (2004); *State v. Revenaugh*, 992 P.2d 769, 772 (Idaho 1999) ("In either case, the arresting officers would still have to have a reasonable, articulable suspicion that someone might be in the residence who could pose a threat in order to conduct even a limited protective sweep."); *Smith v. State*, 565 N.E.2d 1059, 1063 (Ind. 1991) (concluding search was not justified by "inchoate and unparticularized suspicion or hunch" that did not constitute "specific and articulable facts demonstrating any reasonable suspicion of danger"), *overruled on other grounds by Albaugh v. State*, 721 N.E.2d 1233, 1235 (Ind. 1999); *State v. McGrane*, 733 N.W.2d 671, 679 (Iowa 2007) (the State offered no evidence McGrane had weapons in his home, that dangerous people may have been hiding on the premises, or that officers encountered anyone who was dangerous; "The State is still required to allege specific facts and circumstances upon which reasonable inferences could be drawn to support a reasonable police officer's belief that weapons were on the premises and that someone else could have had access to those weapons and inflicted harm."); *State v. Huff*, 92 P.3d 604, 608, 611 (Kan. 2004) (affirming judge's *sua sponte* dismissal of charges after finding "officers' entry into the apartment unsupported by an articulable suspicion that there was anyone inside"); *Brumley v. Commonwealth*, 413 S.W.3d 280, 287 (Ky. 2013) (concluding sweep violated the

14

Fourth Amendment where "the officers had no information whatsoever that an accomplice or other third party may have been with Brumley in the residence" and "the arrest warrant issued for Brumley was for possession of a controlled substance which did not involve accomplices[;] [r]eviewing the evidence as a whole, the Commonwealth has failed to demonstrate that the information obtained by law enforcement officers concerning the presence of guns in the residence, *coupled with the noise coming from inside*, created a rational inference that the mobile home harbored an individual posing a danger to officers on the scene.") (emphasis added); *Commonwealth v. Lewin*, 555 N.E.2d 551, 557 (Mass. 1990); *State v. Rutter*, 93 S.W.3d 714, 725 (Mo. 2002); *State v. Francis*, 117 A.3d 158, 163 (N.H. 2015); *State v. Davila*, 999 A.2d 1116, 1126 (N.J. 2010); *People v. Johnson*, 193 A.D.2d 35, 40 (N.Y. App. Div. 1993), *aff'd*, 633 N.E.2d 1100 (N.Y. 1994); *State v. Dial*, 744 S.E.2d 144, 148 (N.C. 2013); *State v. Schmidt*, 885 N.W.2d 65, 70 (N.D. 2016); *State v. Guggenmos*, 253 P.3d 1042, 1047 (Or. 2011); and *State v. Sanders*, 752 N.W.2d 713, 719 (Wis. 2008). Additionally, several other states' intermediate courts of appeals also agree. *See Copeland v. State*, 247 So.3d 645, 647 (Fla. Dist. Ct. App. 2018); *Groves v. State*, 199 A.3d 239, 243 (Md. Ct. Spec. App. 2018); *State v. Bergerson*, 671 N.W.2d 197, 202 (Minn. Ct. App. 2003); *State v. Levengood*, 61 N.E.3d 766, 771 (Ohio Ct. App. 2016); *State v. McLin*, No. 2019 KW 0082, 2019 WL 1253827, at *1 (La. Ct. App. Mar. 18, 2019); and *People v. Romeo*, No. 265384, 2007 WL 466047, at *2 (Mich. Ct. App. Feb. 13, 2007).

[17] *See Paradis*, 351 F.3d at 29 ("The government's protective sweep argument fails because the officers had no reason to believe that there might be an individual posing a danger to the officers or others . . . . The police knew that Bell, Benning, and Bean were not in the apartment because they had seen them leave and had an officer posted at the door at all relevant times. They also knew that Bean's child was not present . . . . The government implicitly argues that this court should expand the protective sweep doctrine, go beyond *Maryland v. Buie*, and countenance the continuation of searches in situations such as this one, where there is no reasonable basis to conclude that there was a risk to officers or others . . . . [W]e reject the government's argument."); *Menchaca-Castruita*, 587 F.3d at 295 (where there was "no articulable reason to believe that someone else might be inside [the] residence posing a threat to the officer or the bystanders, or that any evidence was at risk of destruction or removal"); *Benas v. Baca*, 159 F. App'x 762, 767 (9th Cir. 2005) ("Based on the record before us, [the officers'] 'look into the door of a room' cannot be permitted as a 'protective sweep' because the defendants have not provided 'specific and articulable facts' to justify the warrantless intrusion."); *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004) ("Here, the government has pointed to no specific, articulable facts suggesting that the backyard or garage harbored anyone who posed a danger to them . . . . [T]he officers had no reason to believe a third person had stayed behind, or that such a person would attack them while they were outside . . . . Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*. Accordingly, we conclude that the officers' entry into the backyard and garage was unreasonable under the Fourth Amendment."); *United States v. Scott*, 517 Fed. App'x 647, 649 (11th Cir. 2013) (invalidating protective sweep where officers could not articulate any basis to conclude that anyone else was inside the home); *see also United States v. Reynolds*, 526 F. Supp. 2d 1330, 1339-41 (N.D. Ga. 2007) (concluding protective sweep exception to the Fourth Amendment's warrant requirement

did not apply where officers could not point to any specific and articulable facts "that would have caused a reasonable officer to believe the house harbored an individual posing a danger to them"); *United States v. Rudaj*, 390 F. Supp. 2d 395, 401 (S.D. N.Y. 2005) (invalidating "protective sweep" where "[t]he agents made no observations that morning that would lead them to believe that somebody else was at the Rudaj residence, nor had they received any prior information to that effect"), *aff'd sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009); *Schultz*, 818 F. Supp. at 1274 ("Under *Buie*, sweeping officers must have reason to believe the premises harbors an individual posing a danger to arresting officers. The officers had no reason to believe that any persons, other than the defendant and his wife, were present on the premises."); *United States v. O'Connell*, 408 F. Supp. 2d 712, 724 (N.D. Iowa 2005) ("[T]he search conducted in this case was . . . not a valid protective sweep. The officers did not have articulable facts to warrant the belief that the van harbored a dangerous person."); *United States v. Neal*, No. 11-028, 2011 WL 4527363, at *4 (E.D. La. Sept. 28, 2011) ("[T]he Government presented no evidence that the agents saw lights, heard movement, or saw anything else to indicate the possibility of other persons in the residence. Nor was there any evidence that defendant sold drugs with others, or was in a position to warn anyone in the house once he was detained."); *United States v. Fitzgerald*, No. 2:04CR320, 2006 WL 1453108, at *2 (W.D. Pa. Mar. 15, 2006) ("In general, an articulable basis to support the belief that there is a reasonable possibility that another individual who poses danger is in the premises or in the immediate area is all that is required for a protective sweep following an arrest just outside the home . . . . But the officers' lack of information or possession of no information concerning such a possibility cannot supply the articulable basis needed for the sweep in the first instance.") (citing *Sharrar v. Felsing*, 128 F.3d 810, 824 (3d Cir. 1997) (quoting *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996) ("'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place."))); *id.* at *3-4 ("The testimony of the government's witnesses failed to establish specific articulable facts which would lead a reasonably prudent officer to believe there was a reasonable possibility that another individual who could pose a danger to the officers or others on the scene . . . . All information gained about the inside of the apartment indicated defendant was the only male inside . . . . All information gained by the officers in surveillance positions was consistent with this understanding and no information was generated to suggest otherwise . . . . Each officer called to testify for the government was forced to admit on cross examination that they had no specific information suggesting any other individual was inside the apartment. Each admitted that the only basis for assuming that another individual might be inside was past historical experience indicating that reliance on the facts and circumstances known about any particular situation may not always prove to be true in the end . . . . Of course, historical experience about other past situations and events cannot without more supply the specific and articulable facts needed to support a belief that in the present situation there is a reasonable possibility that another individual who may launch an attack against the police is inside. Nor can the mere prior gang association of the individual who has been arrested . . . . A protective sweep conducted on the premise that a male voice had threatened the officers from inside and they could not eliminate the possibility that there might have been another male inside, without any specific facts and inferences creating a reasonable suspicion that such was the case, is nothing more than a search based on no information."); *United States v. Romy*, No. 96-CR-607 (JG), 1997 WL 1048901, at *9-11 (E.D. N.Y. Apr. 24, 1997) ("Lack of information [suggesting that another individual was present] cannot provide an articulable basis upon which to justify a protective sweep."); and *United States v. Ali*, No. 05-CR-785(NG)(SMG), 2006 WL

16

court's material departure from established and widely accepted Fourth Amendment jurisprudence evidences a fundamental misunderstanding and inexplicable subjugation of clearly established constitutional protections that have been a cornerstone of American freedom from state-sponsored incursions since the ratification of the Fourteenth Amendment in 1868.

### 2. The officers had completed their arrest and departed the premises with Appellant.

Officers arrested Appellant on his front porch, went across the street for 10-15 minutes, then entered his home to conduct the first of at least four separate warrantless searches. A protective sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger" and "*no longer than it takes to complete the arrest and depart the premises.*" *Buie*, 494 U.S. at 335-36 (emphasis added). Although the panel majority acknowledged the first part of this controlling analysis (*see* Maj. Op. at 6-7), both it and the concurring opinion inexplicably refused to even mention the second part; this refusal naturally leads to a wholesale disregard of the controlling facts that officers had already completed the arrest, departed the premises with Appellant, handcuffed him, and placed him in a police car. *See State v. Smith*, No. 2020-KK-00711, 2020 WL 6154322, at *1 (La. 2020) (per curiam) ("The issue of a protective sweep . . . would nevertheless not seem to be applicable where, as here, the defendant was in handcuffs in a police car when the search was conducted."). This error is significant and requires correction that this en banc court refuses to provide.

In fact, there is no evidence officers had any right to enter the house at all

---

929368, at *7 (E.D. N.Y. Apr. 7, 2006) ("Even if the officers suspected that Hassan or someone else might be present, they had no basis to believe that the individual was dangerous. As noted above, before conducting the second type of *Buie* protective sweep, law enforcement officers must reasonably believe 'that the area to be swept harbors an individual *posing a danger.*'") (emphasis in the original).

because they had no articulable reason (as evidenced by their inability to articulate a reason) to believe anyone else would be found inside. Therefore, there was no reasonable suspicion of danger and the officers' search took significantly longer than the time it took to complete the arrest of Appellant and to depart the premises with him. This unavoidable reality renders this search unconstitutional. *See Buie*, 494 U.S. at 335-36; *see also United States v. Silva*, 865 F.3d 238, 243 (5th Cir. 2017); *United States v. Maxwell*, 734 F. Supp. 280, 284 (S.D. Tex. 1990). Additionally, Appellant produced uncontroverted expert testimony that the arresting officers' conduct after Appellant's arrest placed them in greater risk under the circumstances. Here, such increased risk to officers runs afoul of the precise justifications for protective sweeps.[18]

This court's steadfast refusal to even acknowledge (never mind adhere to) a controlling constitutional test from the United States Supreme Court applicable to the officers' departure from the premises with Appellant earns us a truly dubious and disquieting distinction in the annals of Fourth Amendment jurisprudence, particularly given the number of state courts that at least recognize the existence of said test.[19]

---

[18] *See Buie*, 494 U.S. at 327 ("A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."); *cf. Menchaca-Castruita*, 587 F.3d at 295 ("[T]he officers in the instant case were safely outside of the subject residence and all bystanders even further removed. If anything, the officers increased the potential danger to themselves and the bystanders when they proceeded to enter the residence."); *United States v. Owens*, 782 F.2d 146, 151 (10th Cir. 1986) (once police arrest a person in a hallway outside his hotel room and retreat to safe area, justification for protective sweep evaporates).

[19] *See, e.g., Brand*, 204 P.3d at 385; *State v. Marshall*, No. 1 CA-CR 09-0046, 2010 WL 286773, at *7 (Ariz. Ct. App. Jan. 26, 2010); *Spencer*, 848 A.2d at 1195-97; *Green v. United States*, 231 A.3d 398, 407 (D.C. 2020); *Copeland*, 247 So.3d at 647; *State v. Schaffer*, 982 P.2d 961, 965 (Idaho Ct. App. 1999); *People v. Curtis*, No 1-15-2308, 2018 WL 1998015, at *7 (Ill. App. Ct. Apr. 25, 2018); *Smith*, 565 N.E.2d at 1062; *McGrane*, 733 N.W.2d at 678; *State v. Luttig*, 54 P.3d 974, 977 (Kan. Ct. App. 2002); *Dieterlen v. Commonwealth*, No. 2010-CA-

### 3. The panel majority relies upon materially incorrect facts.

The panel majority also concluded that "witnesses gave conflicting accounts about how many children were in the car that left the home, which suggested that not all of the children left the home and at least one might still be inside the house." Maj. Op. at 10. My review of the record, however, reveals no inconsistent testimony concerning the number of children in the car; instead, (1) Deputy Alexander (the team leader) testified that he thought there were no children in the home, (3 RR 61) (2) Deputy Alexander believes "[i]t's always a possibility" that there are more children in a home, (3 RR 59) and (3) officers were informed that "there may be an infant — a small child" at the house. (3 RR 158) Without exceptionally particularized information not present herein, no reasonable officer could ever justifiably believe that an infant or small child (even if present) would elect to take up arms and present *any* constitutionally adequate threat to justify a warrantless governmental entry into the home. Additionally, there is no specific and articulable fact in this record capable of supporting a finding that any officer at the scene had such a fear (or even claimed one). *See Sayers v. State*, 433 S.W.3d 667, 679 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Although Officer LaPoint testified that when approaching a house officers generally 'have to be

002309-MR, 2012 WL 333757, at *2 (Ky. Ct. App. Feb. 3, 2012) (citation omitted); *Smith*, 2020 WL 6154322, at *1; *State v. Ledford*, 914 So.2d 1168, 1174 (La. Ct. App. 2005); *Groves*, 199 A.3d at 243; *Commonwealth v. Saywahn*, 79 N.E.3d 1078, 1080 (Mass. App. Ct. 2017); *People v. Brown*, No. 286716, 2009 WL 4827066, at *2 (Mich. Ct. App. Dec. 15, 2009); *Bergerson*, 671 N.W.2d at 202; *Rutter*, 93 S.W.3d at 725; *State v. Farber*, 498 N.W.2d 797, 801 (Neb. Ct. App. 1993); *Francis*, 117 A.3d at 163; *Davila*, 999 A.2d at 1126; *Johnson*, 193 A.D.2d at 40; *Dial*, 744 S.E.2d at 148; *Schmidt*, 885 N.W.2d at 70; *Levengood*, 61 N.E.3d at 771; *Guggenmos*, 253 P.3d at 1047; *Commonwealth v. Hand*, No. 2579 EDA 2016, 2017 WL 5942045, at *4 (Pa. Super. Ct. Nov. 27, 2017); *State v. Batey*, No. M2001-02958-CCA-R3-CD, 2003 WL 1337834, at *3 (Tenn. Crim. App. Mar. 19, 2003); *Commonwealth v. Williams*, 99 Va. Cir. 321, 2018 WL 8619841, at *2-5 (Va. Cir. Ct. July 6, 2018); *State v. Smith*, No. 66143-4-I, 2012 WL 1071384, at *3-4 (Wash. Ct. App. Apr. 2, 2012); and *State v. Sanders*, 752 N.W.2d 713, 719 (Wis. 2008); *accord Garcia-Lopez*, 809 F.3d at 838-39; *Davila v. United States*, 713 F.3d 248, 259 (5th Cir. 2013); and *Maxwell*, 734 F. Supp. at 284.

careful' because '[y]ou never know what could happen,' he did not testify that he, or any of the other arresting officers, believed that appellant or Scalia posed a threat to their safety, nor did he testify to any specific, articulable facts that would have supported such a belief."); *Reasor*, 12 S.W.3d at 817; *accord United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004) ("Not only was there no objective basis to warrant a reasonable suspicion of danger from a second person, there was also no evidence of subjective fear on the part of the agents.").

Finally, the panel majority (and the concurrence) also found that "Alexander testified he saw a rifle in the residence upon the initial entry into the house." Maj. Op. at 10. This finding plainly mischaracterizes Deputy Alexander's unequivocal testimony that the gun case "was closed" upon his entry. *See* 3 RR 216.

This en banc court's refusal to correct material factual errors utilized by the panel majority to support its flawed constitutional analysis is indefensible.

### 4. The panel majority relies upon irrelevant facts.

The majority cites the "highly cluttered" nature of the home to be a factor justifying the officers' entry into Appellant's home because it "obscure[d] lines of sight." *See* Maj. Op. at 5. This consideration should be irrelevant to our analysis concerning protective sweeps because (without more) it cannot support a reasonable belief that Appellant's home harbored an individual posing a danger to anyone. *See*, *e.g., United States v. Ford*, 56 F.3d 265, 269 n.6 (D.C. Cir. 1995) (noting that "[p]oor lighting . . . [has] nothing to do with a belief that the area harbors 'an individual posing a danger to those on the arrest scene'") and *United States v. Archibald*, 589 F.3d 289, 299-300 (6th Cir. 2009) (officers' perceived vulnerability and inability to see certain parts of the arrestee's residence did not demonstrate that another person was present and posed a danger).

The panel majority also states the surveillance of the home "was not

20

continuous and, as a result, yielded inconsistent information." *See* Maj. Op. at 6. This is insufficient because "allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep. . . . The officers' lack of information 'cannot be an articulable basis for a sweep that requires information to justify it in the first place.'" *State v. Spencer*, 848 A.2d 1183, 1196 (Conn. 2004) (quoting *United States v. Colbert,* 76 F.3d 773, 778 (6th Cir. 1996)).[20] The officers' lack of information is particularly problematic when they have access to information from other officers who deliberately surveilled the house for months before entry.

The panel majority also cites the presence of narcotics traffic at the house as a factor supporting its analysis. Maj. Op. at 10. While we are not the first court to confront this issue, it appears we are the first court willing to permit suspected narcotics trafficking to constitute a permissible basis for a protective sweep without specific and articulable facts that the area harbored an individual posing a

---

[20] *Accord United States v. Nelson*, 868 F.3d 885, 889 (10th Cir. 2017) (citing *Colbert*, 76 F.3d at 778); *id.* ("As we've previously explained, 'there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course . . . .'") (quoting *Carter*, 360 F.3d at 1242-43); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) ("Much of the government's argument why a sweep was needed for protective purposes is not based on any specific facts in the government's possession, but rather is based on the lack of information in the government's possession. The testimony at the suppression hearing indicates that the officers had no information regarding the inside of the warehouse. However, in the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case.") (citing *Colbert*, 76 F.3d at 778; *Sharrar*, 128 F.3d at 825 ("agree[ing] with . . . *Colbert* that '[n]o information cannot be an articulable basis for a sweep that requires information to justify it in the first place'")); *United States v. Mark*, Crim. No. 09-20, 2009 WL 5286598, at *3 (D. V.I. Dec. 28, 2009); *see also Torrez*, 34 S.W.3d at 18 ("The state offered no evidence of what the officers expected to find in the house. Other than a conclusory statement, the affidavit for the state fails to produce additional objective facts or circumstances to indicate that there was another individual inside the dwelling, much less that such an individual was armed and dangerous.").

21

danger to anyone.[21]  The panel majority's reliance upon narcotics in the home as a fact supporting the purported reasonableness of a warrantless search represents a continued insistence on extending constitutional exceptions beyond the breaking point.

The panel majority similarly relies upon the fact that the arrest warrants "related to charges for a violent crime — murder."  *See* Maj. Op. at 5.  Such a consideration also undermines the Supreme Court's rationale in *Buie*, thereby making it unreasonable under the Fourth Amendment.[22]  The panel majority's reliance upon the nature of Appellant's alleged crime as a viable variable when analyzing the propriety of protective sweeps inside private homes continues the improper expansion of existing law while signaling to prosecutors and trial court

_____

[21] *See United States v. Ellis*, 499 F.3d 686, 691 (7th Cir. 2007) ("[I]f we affirm the district court's decision in this case, we have effectively created a situation in which the police have no reason to obtain a warrant when they want to search a home with any type of connections to drugs."); *see also Spencer*, 848 A.2d at 1195-96 ("The generalized *possibility* that an unknown, armed person may be lurking is not, however, an articulable fact sufficient to justify a protective sweep.  Indeed, nearly every arrest involving a large quantity of drugs, in or just outside of a home, carries the same possibility.  To allow the police to justify a warrantless search based solely upon that possibility would threaten to swallow the general rule requiring search warrants.") (emphasis in the original); *Taylor*, 248 F.3d at 514 (generalized suspicion that defendant was a drug dealer was inadequate, standing alone, to justify protective sweep); *Moran Vargas*, 376 F.3d at 116; and *Brumley*, 413 S.W.3d at 287.

[22] *See Brumley*, 413 S.W.3d at 286 ("Similarly, the fact that the officers were there to serve a felony arrest warrant on Brumley is irrelevant to our analysis.  If it were otherwise, a protective sweep would be permitted every time an officer serves a felony arrest warrant.  Such a result would render *Buie* meaningless.  In any event, a defendant's own dangerousness is not relevant in 'determining whether the arresting officers reasonably believed that *someone else inside the house* might pose a danger to them.'") (quoting *Colbert*, 76 F.3d at 777 (emphasis in original)); *see also id.* ("Even a defendant's prior arrests for violent crimes have been determined to be 'irrelevant' under a protective sweep analysis.") (citations omitted); *Archibald*, 589 F.3d at 298-99 ("[I]n [*Colbert*, 76 F.3d at 777], we held that a defendant's own dangerousness is not relevant in 'determining whether the arresting officers reasonably believed that someone else inside the house might pose a danger to them[,]' as those facts reflected only the dangerousness of the arrested individual, not others."); *Colbert*, 76 F.3d at 777 ("If district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep."); *accord State v. Eckard*, 281 P.3d 1248, 1255-56 (N.M. Ct. App. 2012).

judges alike that the alleged crime alone can create a "reasonable suspicion of danger" (*see Buie*, 494 U.S. at 335-36; *Torrez*, 34 S.W. 3d at 18) despite the absence of any specific and articulable facts that there is anyone inside a home. The panel majority's conclusion presumes that those who are indicted (1) are effectively guilty and (2) lose their clearly established rights to privacy inside their homes due to said unadjudicated guilt. The panel majority's unreasonable expansion of police authority to conduct warrantless searches inside homes despite Fourth Amendment protections requires correction that this en banc court refuses to provide.

Finally, this en banc court fails to correct both the State's and the panel's express reliance upon "information that [Appellant] had firearms inside the residence" as one of its purportedly "specific and articulable facts" justifying the officers' protective sweep. *See* Maj. Op. at 10 ("Other specific Articulable Facts Warranting the Sweep . . . Informants had reported guns were on the premises."). No known court has ever permitted the alleged presence of firearms inside a home (without a person capable of wielding them) to be a factor that officers can consider when determining whether to perform a constitutionally permissible protective sweep. Millions of Texas gunowners should not be expected to sacrifice their clearly established Fourth Amendment rights to privacy inside their homes simply because they elect (or worse, allegedly elect) to keep guns inside their homes in accordance with the Second Amendment.[23]

---

[23] *See Brumley*, 413 S.W.3d at 285 ("[C]ommon sense suggests that an overwhelming amount of law abiding citizens in Kentucky have guns in their homes for lawful purposes. In other words, Brumley's rights under the Fourth Amendment cannot be diminished simply by exercising his rights under the Second Amendment. Therefore, this knowledge alone does not create "reasonable suspicion" that the officers were in imminent peril."); *cf. United States v. Kolodziej*, 706 F.2d 590, 596-97 (5th Cir. 1983) (concluding information that the defendant carried a firearm did not justify a "cursory safety check inspection" of his residence because officers failed to show there was "a serious and demonstrable potentiality for danger.") (citing

23

## B.    The plain view doctrine is inapplicable.

### 1.    Officers were not legitimately present in Appellant's home.

The State argues (and the panel majority and concurrence accept) that the drugs found during the initial search were found in plain view. *See* Maj. Op. at 15; Concurring Op. at 9-10. This conclusion is both plainly erroneous and unsupported by the record. The plain view doctrine only applies if the officers in question were legitimately in the place where the doctrine purportedly applies. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *Ramos v. State*, 934 S.W.2d 358, 365 (Tex. Crim. App. 1996) (citing *State v. Haley*, 811 S.W.2d 597, 599 (Tex. Crim. App. 1991) (en banc); *Stoker v. State*, 788 S.W.2d 1, 9 (Tex. Crim. App. 1989)). The officers had no right to be inside Appellant's home as evidenced by (1) the absence of specific and articulable facts that said home harbored an individual posing a danger to those on the arrest scene (*Buie*, 494 U.S. at 337) and (2) officers' completion of the arrest and departure from the scene with Appellant (*id.* at 335-36). Therefore, the plain view doctrine does not apply and cannot permissibly bootstrap an unconstitutional search.

### 2.    The drugs were neither searched nor seized before a warrant was issued.

Assuming *arguendo* that the officers had a right to be inside Appellant's home, the narcotics in question were neither searched nor seized before a search warrant was acquired; this important fact distinguishes this case from most cases involving the plain view doctrine.[24] The relevant invasion of privacy at issue was

---

*United States v. Capote-Capote*, 946 F.2d 1100, 1103 (5th Cir. 1991) ("[T]he mere presence of weapons or destructible evidence does not alone create exigent circumstances.") (citing *United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986); *United States v. Smith*, 515 F.2d 1028, 1031 (5th Cir. 1975) (per curiam), *cert. denied*, 424 U.S. 917 (1976)).

[24] *See United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Even when government agents may lawfully seize . . . a package to protect loss or destruction of suspected contraband,

the officers' entry into Appellant's home, not their viewing of black opaque trash bags therein that (under the circumstances) obscured immediately apparent criminality. *See infra.* Therefore, I believe the panel majority's reliance upon the plain view doctrine is improper.

### 3. The opaque bag in which the narcotics were concealed did not reveal immediately apparent criminality.

The law of the land clearly states that before searching or seizing evidence without a warrant, the "incriminating nature of the item must be immediately apparent."[25] The Texas Court of Criminal Appeals has defined the "immediately apparent" component of the plain view doctrine to mean "probable cause to associate the item with criminal activity." *Ramos*, 934 S.W.2d at 365.[26] Both the panel majority and the concurrence erroneously concluded (without any

---

the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package.") (footnote omitted); *Horton v. California*, 496 U.S. 128, 130 (1990) (addressing warrantless seizure under the plain-view doctrine); *Coolidge v. New Hampshire*, 403 U.S. 443, 464 (1971) (same); *Dickerson*, 508 U.S. at 368 (same); *Illinois v. Andreas*, 463 U.S. 765 (1983) (same); *Payton*, 445 U.S. at 586-87 (same); *Collins v. Virginia*, 138 S. Ct. 1663 (2018) (same); *Hicks*, 480 U.S. at 327-28 (analyzing warrantless search under the plain-view doctrine); *United States v. Ross*, 456 U.S. 798, 800 (1982) (analyzing warrantless search when items are not in plain view); *Texas v. Brown*, 460 U.S. 730, 749-51 (1983) (Stevens, J., concurring) (plain view doctrine supports the warrantless seizure of a closed container but not the warrantless search of its contents that were not visible to the police).

[25] *See Ramos*, 934 S.W.2d at 365 (citations omitted); *State v. Rodriguez*, 521 S.W.3d 1, 18 (Tex. Crim. App. 2017) (citing *State v. Dobbs*, 323 S.W.3d 184, 187 (Tex. Crim. App. 2010)); *see also Dickerson*, 508 U.S. at 375 (citing *Horton*, 496 U.S. at 136-37); *Coolidge*, 403 U.S. at 465-66.

[26] *See also Dickerson*, 508 U.S. at 375 ("If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object — *i.e.*, if 'its incriminating character [is not] "immediately apparent"' . . . — the plain-view doctrine cannot justify its seizure.") (internal citations omitted, brackets provided by the Supreme Court); *Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012) (citing *Martinez v. State*, 17 S.W.3d 677, 685 (Tex. Crim. App. 2000) (citing *Ramos*, 934 S.W.2d at 365)); *Ford v. State*, 179 S.W.3d 203, 211 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *cf. Hicks*, 480 U.S. at 326 (not requiring probable cause "would be to cut the 'plain view' doctrine loose from its theoretical and practical moorings").

meaningful analysis) that "the finding of the narcotics sitting outside the back porch in plain view and tips that narcotics were being sold from the house, firmly [sic] establishes probable cause to search the entire residence for narcotics." Maj. Op. at 15; Concurring Op. at 9-10 ("Alexander did not open the bags but testified, according to his training and experience, the bags *looked like* they contained narcotics.") (emphasis added). This conclusion evidences a misunderstanding of the Fourth Amendment.

Despite these erroneous conclusions, a "brick of cocaine in a red, opened suitcase on the back porch" was not in plain view. *See* Maj. Op. at 5. Deputy Alexander testified that (1) "the first narcotics [he] saw were in the red bag right outside the back door," (2) they were in *closed black bags*, and (3) State's exhibits 11 and 12 depict the scene in the same condition in which he first saw them. Using the same terminology for the secondary search, he testified that to him, it looked like the subsequently discovered narcotics were in black trash bags[27] *that were unopened* and that officers "did not touch" them. Deputy Alexander then testified that other officers acquired a search warrant based on information he acquired during his first search; specifically, he swore: "I said that I saw narcotics on the back porch and inside in plain view."

These facts illustrate the lengths to which both police officers and this Court will go to ignore the nuanced contours of Fourth Amendment jurisprudence. There is zero evidence capable of supporting this court's implicit conclusions that Deputy

---

[27] *See* 3 RR 94-95 ("Q. How did you know or how did you suspect that narcotics were in there? A. Just by my training and experience. Q. Just by your training and experience you see these trash bags there and you suspect narcotics? A. I mean, that's what it looked like to me, yes. Q. Okay. But you could not see? A. No, I did not physically open them and look at them, no."). *See also* 3 RR 154-155 ("Q. Did you see who tore open the bags, the garbage bags? A. . . . Those bags were found by Special Agent Broussard . . . . Q. So Broussard was the one that opened the bags and tore them apart? A. Yes, ma'am.").

26

Alexander could see through the opaque bags shown in State's exhibits 11 and 12,[28] that the bags clearly announced their contents without further exploration or examination, or that the incriminating nature thereof was immediately apparent. *See Ramos*, 934 S.W.2d at 365. Deputy Persaud then swore in his search warrant affidavit that Deputy Alexander told him the drugs found in the red suitcase were wrapped in black electrical tape despite (1) the absence of any evidence tending to prove they were wrapped in black electrical tape and (2) Deputy Alexander's unambiguous testimony that they were in black bags. We are not permitted to either rewrite or ignore material portions of Deputy Alexander's clear testimony concerning what he saw in an attempt to justify a plainly unconstitutional search.[29]

In sum, it simply defies reason to conclude that while conducting an ostensibly legitimate protective sweep for threats inside a small house (that, according to uncontroverted expert testimony, should have taken two or three minutes), an officer who perceives black trash bags inside of a red suitcase can reasonably conclude that the criminality thereof is "immediately apparent". Despite the fact that any number of flat, box-like innocuous objects could be wrapped in black trash bags inside a suitcase inside a home (including small boxes, books, DVD box sets, several video game boxes, or wrapped gifts), we are expected to blindly accept that an officer who neither touched, opened, nor smelled the black trash bags in question while conducting a sweep for threats legitimately and acceptably concluded their criminality was immediately apparent. This

---

[28] *See Bond v. United States*, 529 U.S. 334, 336-37 (2000) (court held defendant preserved his privacy on a bus by placing the drugs in an opaque bag).

[29] The concurrence opines, "Again, the dissent has chosen to substitute its credibility determination for that of the magistrate and the trial court." Concurring Op. at 10. Again, this demonstrates a misunderstanding of the law; even when I accept *arguendo* that the State's evidence is completely true, the officers' conduct remains unreasonable under the Fourth Amendment and clearly established precedents interpreting same.

unsupportable expectation constitutes a continued and flagrant attack on clearly established Fourth Amendment rights.

**C.      The panel majority relies upon readily distinguishable precedents.**

The panel majority's analysis also relies upon readily distinguishable federal authorities.   In *United States v. Hoyos*, 892 F.2d 1387, 1395 (9th Cir. 1989), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001) (en banc), the court recognized that "additional suspects . . . were expected to be found" at the residence in question.  Specifically, multiple officers testified that they knew four people had been seen at the residence and believed "there were others in the house who could pose a danger" to the officers' safety or could "attempt to destroy evidence."  *Id*.  Here, officers did not expect to find anyone at the residence after two and a half months of recorded and physical surveillance. Therefore, *Hoyos* is readily distinguishable.

In *United States v. Jackson*, 700 F.2d 181, 184, 190 (5th Cir. 1983), the arrestee "indicated that two other individuals were involved in the case and that they might be armed"; agents then observed suspects leaving a motel room, "had no way of knowing that the two suspects were the only remaining people involved in the exchange," and "had reason to believe that a gun was somewhere in the motel."  Under those facts, it was "clear" to the Fifth Circuit "that the cursory search of the motel rooms resulted from the agent's reasonable belief that an immediate security sweep of the premises was required for their own safety and the safety of others at the motel."  *Id.* at 190.  Here, officers did not have any fact leading them to believe anyone else was in the home.  Therefore, *Jackson* is readily distinguishable.

In *United States v. Lawlor*, 406 F.3d 37, 39 (1st Cir. 2005), a police officer received reports of a gunshot, detained two combatants outside a home, and saw

28

spent shotgun shells. After Lawlor refused to identify the whereabouts of the weapon, the officer entered the home and found a sawed-off shotgun. *Id*. at 39-40. The First Circuit determined the officer's entry was lawful because (1) he had received a report of a gunshot, (2) he believed Lawlor and his brother both lived at the home, (3) he did not know the whereabouts of the brother, (4) he did not know the whereabouts of the gun, and (5) Lawlor refused to answer questions about the gun.[30] *Id*. at 42-43. None of these facts are present here; therefore, *Lawlor* is inapposite.

In *United States v. Oguns*, 921 F.2d 442, 445-46 (2d Cir. 1990), officers knew Oguns lived with his brother, arrested him for possession of heroin outside his home, saw an open apartment door, and (after learning it belonged to Oguns) conducted a two-minute protective sweep. There, the Second Circuit re-affirmed its previous holding that protective sweeps are permissible when arresting officers have "(1) a reasonable belief that third persons [are] inside, and (2) a reasonable belief that the third persons [are] aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." *Id.* at 446 (quoting *United States v. Vasquez*, 638 F.2d 507, 531 (2d Cir. 1980) (quoting *United States v. Agapito*, 620 F.2d 324, 336 n.18 (2d Cir. 1980))). None of these facts are present herein, thereby rendering *Oguns* inapposite.

_____

[30] The First Circuit subsequently refined its holding concerning protective sweeps in *United States v. Delgado-Pérez*, 867 F.3d 244 (1st Cir. 2017). There, the court observed that the distinguishing factor between the two cases was that the officers in *Lawlor* had "knowledge of facts . . . that provided them with an *articulable reason* to suspect that some person other than the one arrested could be present in the residence and pose a danger to officers." *Id*. at 252 (emphasis added); *see also id.* at 253 (despite surveillance and intel, there was no "evidence than another person might be present in the home at the time of the arrest, let alone that another dangerous person would be."); *Paradis*, 351 F.3d at 29 (affirming district court's granting of a motion to suppress where officers watched several people leave, knew neither they nor a known child were present in the home, and "had no reason to believe that there might be an individual posing a danger to the officer or others[.]").

In *United States v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003), officers went to a home to execute an arrest warrant, knew firearms had previously been found therein during a previous search, performed an arrest outside the home, and were told there was someone else inside the house. Officers went inside, announced their presence, received no response, conducted a protective sweep (to which the arrestee consented), found the other individual, and brought him outside. *Id.* at 994-95. Officers were inside the home for approximately 90 seconds. *Id.* at 995. Therefore, *Cavely* is not even close.

## IV. Response to the Concurrence

In his concurring opinion, Justice Zimmerer (1) endeavors (without citation to any relevant authority) to substitute personal post-hoc judicial perceptions of specific and articulable facts for the officers' failures to articulate such facts, (2) endeavors (without citation to any relevant authority) to substitute Deputy Alexander's personal experience and uncertainty for specific and articulable facts, and (3) demonstrates a serious misunderstanding of the Fourth Amendment via an apparent effort to sanitize governmental violations of clearly established constitutional rights. *Compare* Concurring Op. at 4 (Zimmerer, J., concurring in the denial of en banc relief) ("In this case appellant was seized when he was ordered to the floor of the residence.") *with Wexler v. State*, 593 S.W.3d 772, 779 (Tex. App.—Houston [14th Dist.] 2019) (Zimmerer, J.) ("The fact that appellant's freedom of movement was restricted [when she was ordered to leave a house by police officers then placed in a police car] does not establish that she was under custodial arrest . . . ."), *aff'd*, No. PD-0241-20, 2021 WL 2677427, at *1-6 (Tex. Crim. App. June 30, 2021).

## V.       Conclusion

We are charged with the task of "lay[ing] course between the overhanging absurdity of the sporting theory of justice on the one side and the menace of police irruption into residences on the other." *United States v. Cravero*, 545 F.2d 406, 418 (5th Cir. 1976). A majority of this court has now abdicated its responsibility to the people of our district and instead has chosen to authorize warrantless 20-minute comprehensive searches of private homes, even when (1) the subject of the only proper warrant is arrested outside, (2) no fact suggests anyone can be found inside, (3) no fact supports a reasonable suspicion of danger, (4) officers have completed their outdoor arrest, and (5) officers have departed the premises with their arrestee for 10 to 15 minutes before returning to the premises to enter the home.

This court effectively approves a new rule that swallows the Fourth Amendment; if police break in a home's doors and windows without a search warrant, they are authorized to conduct a search to make sure there was no reason to conduct a search and to secure any items that may have warranted one. "Under the Court's decision, the Fourth Amendment no longer stands as a bar to such tyranny and oppression." *Harris v. United States*, 331 U.S. 145, 194 (1947) (Frankfurter, J., dissenting), *overruled in part by Chimel v. California*, 395 U.S. 752 (1969). This court's constitutional activism relies upon no applicable precedent precisely because it cannot co-exist with a reasonable interpretation of the Fourth Amendment.

This court also unreasonably expands warrantless (and therefore presumptively unreasonable) police entry into private residences by permitting that which the Fourth Amendment plainly prohibits. This expansion is contrary to this court's precedent, controlling precedent, and substantial persuasive precedent from

31

state and federal courts from across the country and demands relief this en banc court refuses to provide. Aside from relying upon materially incorrect facts, it also constitutes an extraordinary departure from basic principles of constitutional law concerning the sanctity of private homes and the right to bear arms. Left uncorrected, this court's decision simultaneously and unacceptably (1) diminishes Texans' protections under both the Fourth Amendment and the Second Amendment to the United States Constitution and (2) implicitly approves this Harris County unit's custom or practice of conducting protective sweeps on every house to which it is called regardless of how much information it receives, how much information is readily available, and officers' subjective beliefs that no one is inside.

"[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Hicks*, 480 U.S. at 329. Essentially, this court has (again) unilaterally disregarded constitutional protections in a misguided effort to protect the police from the public.[31] This constitutes a fundamental misunderstanding of the Bill of Rights.

Therefore, I dissent.

---

[31] *See Harris Cty. v. Coats*, 607 S.W.3d 359, 394 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (Bourliot, J., dissenting from denial of en banc reconsideration) ("The majority opinion neuters the protections set forth in *Monell* — protections carefully designed to ensure that citizens can hold local government and other municipalities accountable for violating their clearly established constitutional rights through unconstitutional policies, practices, customs, or procedures.") (citation omitted).

/s/     Meagan Hassan
Justice


En Banc Court consists of Chief Justice Christopher and Justices Wise, Jewell, Bourliot, Zimmerer, Spain, Hassan, Poissant, and Wilson. Chief Justice Christopher and Justices Wise, Jewell, Zimmerer, and Wilson join the Order denying Appellant's Motion for En Banc Reconsideration. Justice Zimmerer authored a Concurring Opinion On Denial of En Banc Relief. Justices Bourliot, Spain, Hassan, and Poissant would have the en banc court decide this case. Justice Hassan authored this Dissenting Opinion From Denial of En Banc Relief, in which Justices Bourliot and Spain joined. Justice Poissant authored a Dissenting Opinion From Denial of En Banc Relief.

Publish — Tex. R. App. P. 47.2(b).

33